Leo E. OLLINGER and Mildred
A. Ollinger, Appellees,

v.

Steven F. BENNETT and Marilyn
J. Bennett, Appellants.

No. 95–1887.

Supreme Court of Iowa.

April 23, 1997.

Margaret T. Lainson and Charles A. Meardon of Meardon, Sueppel, Downer & Hayes, Iowa City, for appellants.

Steven E. Ballard and Mark C. Danielson of Leff, Haupert, Traw & Willman, L.L.P., Iowa City, for appellees.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, NEUMAN, and TERNUS, JJ.

McGIVERIN, Chief Justice.

This appeal requires us to determine whether the trial court properly quieted title to disputed property in the plaintiffs based on the theory of boundary by acquiescence. We must also decide whether the trial court erred in dismissing the defendants' counterclaim for intentional infliction of emotional distress. Because we find no error in the trial court's judgment, we affirm.

I. *Background facts and proceedings.* This controversy revolves around a strip of land near the record boundary between parcels now owned by plaintiffs Leo and Mildred Ollinger and defendants Steven and Marilyn Bennett.

In June 1972 the Ollingers bought a tract of land in Johnson County, Iowa. The legal description of the property as set forth in the warranty deed excluded a parcel of 1.006 acres which earlier had been conveyed to another party and then in April 1972 to Lowell Coburn, Jr.

From the time they purchased their respective properties in 1972, both the Ollingers and Coburn treated an existing fence and a line of trees planted by Coburn as the western and northern boundaries of Coburn's property, so that the land west of the fence and north of the tree line was maintained as part of the Ollingers' property. This configuration meant that 0.35 acre, or about one-third, of Coburn's property was treated as the Ollingers' property. At present, the Ollingers and Bennetts disagree as to ownership of this .35 acre, which hereafter will be referred to as the "disputed property."

The Ollingers made sharecropping arrangements with other persons for some of their property, including the land west of the fence and north of the tree line. At other times they rented the property to people who used it for pasturing cattle and horses. A corral was built west of the fence to accommodate renters who pastured horses on the disputed property. The Ollingers planted trees on the disputed property. However, the Ollingers did not pay property taxes on the land west of the fence and north of the tree line.

During the time he owned the property adjoining the Ollingers' land, Coburn never discussed the boundaries with the Ollingers, nor did he indicate to others that he owned the property now in dispute. Shortly after buying his property in 1972, Coburn planted the line of trees mentioned previously on what he understood to be the northern boundary of that property. In the mid-1970s Coburn sought and received the Ollingers' permission to run drainage tile from his house to the area north of the tree line. He never maintained or improved the land west of the fence or north of the tree line. In 1988 Coburn sold his land to Gary and Janine Griffin.

In 1988 plaintiffs Ollinger subdivided their land so that they could give one-acre parcels to each of two children. This process required a survey, which was completed. In addition, the Ollingers executed a fence agreement which governed fence arrangements in the subdivision and stated in part:

> Nothing herein contained shall be construed as requiring the relocation of the existing fences, even though the same may not set exactly on the boundary lines between the properties, and the parties agree that the actual legal descriptions of the respective properties represent the true and correct boundary lines between said properties.

After the property was subdivided, a gravel access road was constructed on the Ollinger property from the public street and the Ollingers' children, Donna Zender and Nick Ollinger, built homes on their one-acre parcels.

The dispute over the .35–acre area began in 1993 as the Griffins, Coburn's successors in title, prepared to convey their property to defendants Steven and Marilyn Bennett. Following a survey commissioned by the Griffins, Gary Griffin confronted the Ollingers about the boundary line. Donna Zender, the Ollingers' daughter, called the Bennetts to advise them of a potential dispute regarding the property. According to the Bennetts, they were aware that the western boundary of the property was in dispute. Nevertheless, the Bennetts purchased the property and removed part of the fence that previously had been treated as the western boundary line. The Ollingers indicated to the Bennetts that the Ollingers were willing to pay the Bennetts for the disputed land in order to avoid litigation, but the Bennetts refused to sell the property, citing county regulations concerning the size of residential lots.

Sometime in the summer of 1993, the Ollingers' son, Nick Ollinger, erected a sign on the Ollingers' property beside the private access road and near the Bennetts' property. The sign read: "Private Drive—Violators Will Be *Shot*." Nick apparently had not sought his parents' permission to put up the sign, and he had the sign removed shortly afterwards. The sign was later reinstalled, with the Ollingers' permission, after it was

changed to read: "Private Drive—Violators Will Be Dealt With." According to plaintiff Mildred Ollinger, Nick had erected the sign in an attempt to discourage motorists who were using the private access road in an unsafe manner. However, the Bennetts viewed the sign as a threat directed at them.

In September 1993 the plaintiffs Ollinger brought the present quiet title action in district court against defendants Bennett with regard to the disputed .35–acre property, claiming that the fence and tree line had been established as boundaries by acquiescence. *See* Iowa Code ch. 650 (1993). In their answer, the Bennetts alleged an affirmative defense based on a claimed conflict between any such acquiescence and Johnson County zoning and health requirements. The Bennetts also counterclaimed against the Ollingers, asserting slander of title and intentional infliction of emotional distress by the Ollingers on them.

Following a trial, the district court quieted title to the disputed property in the Ollingers and dismissed the Bennetts' counterclaim based on slander of title and intentional infliction of emotional distress. The trial court also overruled the Bennetts' post-trial motion to enlarge and amend the judgment.

Defendants Bennett appealed. On appeal, they contend: (1) that the trial court erred in quieting title to the disputed property in the Ollingers; and (2) that the trial court erred in failing to award damages on their counterclaim for intentional infliction of emotional distress.

II. *Standard of review.* An action brought under Iowa Code chapter 650 is a special action and is heard on appeal as an ordinary action. Iowa Code §§ 650.4, .15. As in an action at law, our review is on assigned errors of law. *Tewes v. Pine Lane Farms, Inc.,* 522 N.W.2d 801, 804 (Iowa 1994). The district court's judgment has the effect of a jury verdict; thus, we are bound by the district court's findings of fact if supported by substantial evidence. *Brown v. McDaniel,* 261 Iowa 730, 732, 156 N.W.2d 349, 351 (1968).

III. *Boundary by acquiescence.* Defendants Bennett challenge the trial court's rul-ing quieting title in the Ollingers on the following grounds: (1) the Ollingers had repudiated any previous acquiescence by ordering the 1988 survey and signing the fence agreement during the process of subdividing their property; (2) the change in boundary lines, which would result from the claimed acquiescence, would violate Johnson County zoning requirements and health regulations; and (3) the percentage of land that would be transferred, if acquiescence were established, exceeds that contemplated by Iowa Code chapter 650. We turn now to these arguments.

A. *Repudiation of acquiescence.*

1. Iowa Code chapter 650 codifies the doctrine of acquiescence, by which a boundary line contrary to a property's legal description may be established. Section 650.14 provides:

> If it is found that the boundaries and corners alleged to have been recognized and acquiesced in for ten years have been so recognized and acquiesced in, such recognized boundaries and corners shall be permanently established.

We have defined "acquiescence" as follows:

> It is the mutual recognition by two adjoining landowners for ten years or more that a line, definitely marked by fence or in some manner, is the dividing line between them. Acquiescence exists when both parties acknowledge and treat the line as the boundary. When the acquiescence persists for ten years the line becomes the true boundary even though a survey may show otherwise and even though neither party intended to claim more than called for by his deed.

*Sille v. Shaffer,* 297 N.W.2d 379, 381 (Iowa 1980). Both parties must be aware that the asserted property line is being treated as a boundary. *Tewes,* 522 N.W.2d at 806; *Sille,* 297 N.W.2d at 381; *see Brown,* 261 Iowa at 735, 156 N.W.2d at 352 ("Acquiescence in the existence of a fence as a barrier, not as a boundary, is not such recognition as will establish it as the true line."). Recognition of a boundary "may be by conduct or claim asserted," *Brown,* 261 Iowa at 735, 156 N.W.2d at 352; thus, acquiescence "may be inferred

by the silence or inaction of one party who knows of the boundary line claimed by the other and fails to take steps to dispute it for a ten-year period." *Tewes,* 522 N.W.2d at 806.

█ Determining whether acquiescence has been established requires an inquiry into the factual circumstances of each case. *Id.* at 808. Previous Iowa cases have utilized several factors that are helpful in making such a determination. *See, e.g., Sille,* 297 N.W.2d at 381 (stating that one party had exercised dominion over the later-disputed property by maintaining and improving the property); *Novotny v. Robbins,* 492 N.W.2d 216, 219 (Iowa App.1992) (pointing to the fact that one party had asked the other party for permission to dig a hole on the later-disputed property); *Drake v. Claar,* 339 N.W.2d 844, 846 (Iowa App.1983) (noting that there was evidence one party had told the other party, during the period of alleged acquiescence, that the fence in question was not the true boundary).

█ 2. Defendants Bennett do not seriously dispute that the Ollingers and Coburn treated the fence and tree line as the western and northern boundaries of Coburn's property (now the Bennetts' property) for more than the requisite ten years. Indeed, Coburn testified at trial as a witness for the Ollingers and corroborated the Ollingers' claim that they treated the fence line and tree line as the boundary lines of Coburn's property.

The Ollingers had others farm the disputed property on a sharecrop basis, rented out the property for pasture, planted trees on the property, and gave permission for Coburn to run drainage tile on the property. For his part, Coburn planted trees to mark what he thought was the northern boundary, sought permission from the Ollingers with regard to running the drainage tile beyond the tree line, and never indicated to others that he owned the now-disputed property. Thus, both the Ollingers and Coburn recognized the fence and tree line as the boundaries between their properties from the time they purchased those properties in 1972 until Coburn sold his land to the Griffins in 1988.

3. While these circumstances would seem to establish the fence and tree line as the boundaries by acquiescence, the Bennetts contend that the survey and fence agreement completed by the Ollingers in 1988, after the running of the ten-year period for acquiescence but before the Ollingers filed the present quiet title action, defeat any acquiescence. This argument has two subparts: (1) that acquiescence was not established before 1988 because it had not been manifested by some affirmative act; and (2) the 1988 survey and fence agreement negated or repudiated the circumstances pointing toward acquiescence.

█ Neither of these arguments finds support in prior Iowa case law. There is no requirement of some overt act in order to establish acquiescence. In *Sorenson v. Knott,* 320 N.W.2d 645, 647 (Iowa App.1982), our court of appeals noted that acquiescence "may be inferred from silence when there is notice of another party's claim." In *Tewes,* 522 N.W.2d at 808, we reiterated that "a landowner's inaction is sufficient to meet the consent element of acquiescence." In that case, we held that actions taken by one party in an attempt to negate the acquiescence were too late, because the ten-year period required for acquiescence had already run. *Tewes,* 522 N.W.2d at 808. Therefore, because both the Ollingers and Coburn treated, for well over ten years, the fence and tree line as the western and northern boundaries of the property then owned by Coburn, those boundaries were established by acquiescence.

█ We do not believe that the actions taken by the Ollingers after the ten-year period required for acquiescence negate or repudiate such acquiescence in this case. The Bennetts rely on two early, non-precedential Iowa cases in their challenge to the Ollingers' claim of ownership by acquiescence; however, even if considered as precedent, those cases do not support the Bennetts' claim.

█ Moreover, we believe scrutinizing parties' conduct, after acquiescence has been established, for signs of repudiation would undermine the purpose of establishing boundaries by acquiescence. The doctrine of

acquiescence represents an attempt to settle titles and "avoid litigation resulting from the disturbance of boundaries long established." *Miller v. Mills County*, 111 Iowa 654, 662, 82 N.W. 1038, 1041 (1900); *see also King v. Fronk*, 14 Utah 2d 135, 378 P.2d 893, 896 (1963) (noting that the doctrine prevents "protracted and often belligerent litigation usually attended by dusty memory, departure of witnesses, unavailability of trustworthy testimony, irritation with neighbors and the like"); 12 Am.Jur.2d *Boundaries* § 85, at 620 (1964) (explaining that the doctrine of acquiescence "is a rule of repose for the purpose of quieting titles and discouraging confusing and vexatious litigation"). We believe that the goals underlying the doctrine of acquiescence are best served in this case by giving effect to the conduct of the owners of both parcels between 1972 and 1993.

We conclude that substantial evidence supports the district court's finding that the fence and tree line recognized by the Ollingers and the Bennetts' predecessors in title since 1972 as the western and northern boundaries of the Bennetts' property were established by acquiescence. We further conclude, as the district court impliedly did, that the actions of the Ollingers after the required ten-year period did not negate that acquiescence. In so doing, we do not suggest that parties cannot expressly repudiate a boundary previously recognized as such. *See* Iowa Code § 650.17 (setting forth process by which parties may determine boundaries by written agreement).

B. *Conflict with county regulations.* Because Johnson County zoning requirements and health regulations specify that suburban residential lots must be at least one acre in size, the Bennetts argue that the boundaries which would be established by acquiescence in this case would cause their lot to be smaller than one acre and thus such boundaries cannot be recognized. We do not agree.

■ Iowa Code chapter 650 does not address compliance with local ordinances. As previously noted, section 650.14 states:

If it is found that the boundaries and corners alleged to have been recognized and acquiesced in for ten years have been

so recognized and acquiesced in, such recognized boundaries and corners shall be permanently established.

We do not believe the mandates of that statute can be disregarded. It is well established that state law prevails over local ordinances. *Green v. City of Cascade*, 231 N.W.2d 882, 890 (Iowa 1975). We conclude that any inconsistency between the county requirements and the statute cannot preclude application of the statute.

■ C. *Amount of land at issue.* The Bennetts contend the amount of land affected here exceeds that envisioned by Iowa Code chapter 650. However, the statute places no restrictions on the amount of land which may be involved when boundaries are established by acquiescence, and the Bennetts have not cited any authority suggesting that the legislature intended to do so. It is beyond the scope of our authority to establish such limitations. We therefore reject the Bennetts' argument.

We find no error in the trial court's judgment that quieted title to the disputed land in the Ollingers.

IV. *Intentional infliction of emotional distress.* In their counterclaim, defendants Bennett allege that the sign erected on the Ollingers' land by the Ollingers' son, Nick, constituted intentional infliction of emotional distress on the Bennetts by plaintiffs Ollinger. Recognition of this claim requires: (1) establishment of the elements of intentional infliction of emotional distress; and (2) a finding that Nick acted as agent for the Ollingers. Because we decide the issue on the basis of the first requirement, we do not address whether Nick acted as the Ollingers' agent.

■ In order to establish a prima facie case for intentional infliction of emotional distress, a plaintiff must demonstrate all of the following:

(1) Outrageous conduct by the defendant[s];

(2) The defendant[s]' intention of causing, or reckless disregard of the probability of causing, emotional distress;

(3) The plaintiff[s] suffering severe or extreme emotional distress; and

(4) Actual and proximate causation of the emotional distress by the defendant[s]' outrageous conduct.

*Millington v. Kuba,* 532 N.W.2d 787, 793 (Iowa 1995); *Meyer v. Nottger,* 241 N.W.2d 911, 918 (Iowa 1976).

■ We do not believe the trial court erred in determining the Bennetts did not demonstrate that they suffered severe or extreme emotional distress. Marilyn Bennett testified that the sign exacerbated her problem with high blood pressure and contributed to sleepless nights. We agree with the trial court that these symptoms do not rise to the level required for severe emotional distress. *See Millington,* 532 N.W.2d at 794 (holding that headaches, insomnia, and loss of appetite were not sufficient to generate a jury question as to severe or extreme emotional distress). Because of this conclusion, it is unnecessary to address the other elements of the tort of intentional infliction of emotional distress.

There is no merit in this assignment of error.

*V. Disposition.* We affirm the judgment of the trial court in all respects.

**AFFIRMED.**